IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| JELITHA MCKENNEY, Individually and as Special Administrator of the Estate of James C. Barnes, Deceased, | ) ) ) ) ) | CASE NO. 8:09CV129 |
| Plaintiff, | ) ) ) | MEMORANDUM AND ORDER |
| v. | ) ) | |
| OFFICER LANCE HARRISON and OFFICER DAWN POLLREIS, in their individual and official capacities, and THE CITY OF OMAHA, | ) ) ) ) ) | |
| Defendants. | ) | |

This matter is before the Court on the Defendants' Motion for Summary Judgment (Filing No. 23), seeking judgment on the merits of the Plaintiff's claims and, alternatively, on the defense of qualified immunity from suit. For the reasons discussed below, the Motion will be granted.

PROCEDURAL BACKGROUND

The Plaintiff Jelitha McKenney brought this action in the District Court of Douglas County, Nebraska, on her own behalf and as the Special Administrator of the estate of her son, James C. Barnes ("Barnes"). (Notice of Removal, Filing No. 1, and attached Complaint ¶ 1.) McKenney alleges that Defendants Lance Harrison and Dawn Pollreis, officers of the Omaha Police Department (the "officers"), entered Barnes's residence on July 31, 2007, and deployed a Taser electroshock weapon against him. McKenney contends that the officers' actions caused Barnes to suffer fatal injuries when he fell through a window after he was shocked.

McKenney's Complaint sets out three theories of recovery. First, she alleges that the officers violated the Fourth, Fifth, and Fourteenth Amendments of the United States Constitution, and 42 U.S.C. § 1983, by subjecting Barnes to an unreasonable search and seizure, an excessive use of force, and the deprivation of his right to due process of law. Second, she alleges that the Defendant City of Omaha failed to train and supervise the officers and failed to develop adequate policies to ensure their lawful, safe, and reasonable use of electroshock weapons, proximately causing the officers' alleged constitutional violations. Third, she presents certain "state law claims," that were the focus of an earlier Motion to Dismiss which the Court granted, in part. (Memorandum and Order, Filing No. 10.) Her claim against the officers in their official capacities based on alleged negligence, her claim against the City of Omaha based on the theory of respondeat superior, and her claim for loss of consortium, all remain.

## FACTS

Harrison and Pollreis at all relevant times were officers of the Omaha Police Department, a division of the Defendant City of Omaha, Nebraska. (Affidavit of Lance Harrison, Filing No. 25-8 ("Harrison Aff.") ¶ 2; Affidavit of Dawn Pollreis, Filing No. 25-9 ("Pollreis Aff.") ¶ 2.) On the morning of July 31, 2007, between 9:30 and 9:50 a.m., the officers went to a house on Manderson Street in Omaha, in search of Barnes. (Harrison Aff. ¶ 3; Pollreis Aff. ¶ 3.) Three warrants had been issued for his arrest by the County Court of Douglas County, Nebraska, and Harrison had spoken to a City Prosecutor to confirm the validity of the warrants. (Harrison Aff. ¶ 3.) Barnes had previously given the Omaha Police Department the Manderson Street address as his residence. (*Id.*) Both officers were in uniform. (*Id.*, ¶ 2; Pollreis Aff. ¶ 2.) Harrison informed Pollreis that Barnes

2

had a history of fleeing, in that Barnes had fled from Harrison at a traffic stop.  (Harrison Aff. ¶ 3.)  Pollreis was not acquainted with Barnes.  (Pollreis Aff. ¶ 3.)

When the officers arrived at the house, Harrison went to the front of the house, and Pollreis went to the side and then the back.  Harrison received no response when he knocked on the front door, and he joined Pollreis at the back of the house.  The back door was open, and the condition of the house led the officers to believe it had been abandoned.  The refrigerator and cabinet doors were open and empty.  There was no furniture, food, or personal effects.  The house was dark, dirty, and not maintained.  The officers entered the house and saw no sign of occupancy.  (Harrison Aff. ¶ 4; Pollreis Aff. ¶ 4.)

Hearing a noise on the second floor, the officers climbed the stairs to determine if squatters were trespassing in the house.  In a second floor bedroom, the officers found a naked woman.  They questioned her about why she was in the house and whether she knew Barnes.  She denied knowing Barnes.  (Harrison Aff. ¶ 5; Pollreis Aff. ¶ 5.)

Harrison discovered Barnes, also naked, in an upstairs bathroom.  (Harrison Aff. ¶ 7.)  Barnes was 21 years old, approximately five feet and nine inches tall, and weighed approximately 225 pounds.  (Filing No. 34-2, Autopsy Report, CM/ECF p. 4.)  Harrison ordered Barnes to enter the bedroom; the officers directed him to get dressed; and Barnes cooperated.  Barnes moved about the room, putting on his shorts, his shirt, and one shoe.  Harrison had handcuffs out, ready to handcuff Barnes once he finished dressing.  (Harrison Aff. ¶ 7; Pollreis Aff. ¶ 6.)  Barnes appeared to be nervous, and glanced toward two windows, one covered with a picture and other material, and the other with a closed glass pane.  (Harrison Aff. ¶ 6, 8; Pollreis Aff. ¶¶ 7-8.)  Fearing that Barnes might attempt to

escape, Harrison blocked the door to the room, and Pollreis took out her Taser weapon. Harrison warned Barnes not to "try anything stupid," and Pollreis told him he didn't "want to be 'tased.'" (Harrison Aff. ¶ 8; Pollreis Aff. ¶¶ 8-9.) Pollreis had been trained in the use of Taser weapons through the Omaha Police Department and was a certified Taser instructor. (Pollreis Aff. ¶ 17.) A Taser is a weapon that fires probes that apply an electric shock that will incapacitate a person. (*Id.* ¶ 8.) It is a non-lethal weapon that causes incapacitation for seconds or minutes. (Filing No. 34-8, Taser User Certification Course Materials.)

As Barnes was putting on his second shoe, he suddenly lunged toward the window that was approximately six to eight feet from where he was standing. (Harrison Aff. ¶ 9; Pollreis Aff. ¶ 10.) Pollreis immediately deployed the Taser, as Barnes moved across the room, and Harrison turned to exit the room and run outside to the front of the house. (Pollreis Aff. ¶10; Harrison Aff. ¶ 9.)

Pollreis expected that Barnes would be incapacitated quickly and would fall to the floor when struck with the Taser. (Pollreis Aff. ¶ 11.) Instead, Barnes crashed through the closed window, to the surprise of Pollreis, taking the Taser probes and wires with him. Pollreis went to the window, but could not see Barnes. There was a front porch roof immediately outside the window, but Barnes was not on the roof. (Pollreis Aff. ¶ 12.) Harrison found Barnes lying on the sidewalk below the porch roof. He appeared to have head injuries, and Harrison called a rescue squad. (Harrison Aff. ¶ 10.)

Barnes died on August 4, 2007, from the head injuries he received from the fall. (Autopsy Report, Filing No. 34-2.)

## STANDARD OF REVIEW

Summary judgment is only proper when the Court, viewing the evidence in the light most favorable to the nonmoving party and drawing all reasonable inferences in the nonmoving party's favor, determines the evidence "show[s] that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Semple v. Federal Exp. Corp.*, 566 F.3d 788, 791 (8th Cir. 2009) (quoting Fed. R. Civ. P. 56(c)). "Where the nonmoving party will bear the burden of proof at trial on a dispositive issue, . . . Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). The moving party need not negate the nonmoving party's claims by showing "the absence of a genuine issue of material fact." *Id.* Instead, "the burden on the moving party may be discharged by 'showing' . . . that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

In response to the movant's showing, the nonmoving party's burden is to produce specific facts demonstrating "'a genuine issue of material fact' such that their claim should proceed to trial." *Nitro Distrib., Inc. v. Alitcor, Inc.*, 565 F.3d 417, 422 (8th Cir. 2009) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). The nonmoving party is required to demonstrate a "genuine issue of material fact" that is outcome determinative–"a dispute that might 'affect the outcome of the suit under the governing law.'" *Bloom v. Metro Heart Group of St. Louis, Inc.*, 440 F.3d 1025, 1030 (8th Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1985)). Thus, a

"genuine issue" is more than "'some metaphysical doubt as to the material facts,'" *Nitro Distrib.,* 565 F.3d at 422 (quoting *Matsushita*, 475 U.S. at 586-87), and "'the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment.'" *Bloom*, 440 F.3d at 1028-29 (emphasis removed) (quoting *Anderson*, 477 U.S. at 247-48).

In other words, in deciding "a motion for summary judgment, [the] facts must be viewed in the light most favorable to the nonmoving party only if there is a genuine dispute as to those facts." *Ricci v. DeStefano*, 129 S. Ct. 2658, 2677 (2009). Otherwise, where the Court finds that "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party"–where there is no "genuine issue for trial"–summary judgment is appropriate. *Matsushita*, 475 U.S. at 587 (citing *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)); *see also Scott v. Harris,* 550 U.S. 372 (2007).

## DISCUSSION

Although the Plaintiff contends that there are many genuine issues of material fact precluding summary judgment, the twenty-one "controverted facts" listed in the Plaintiff's Brief (Filing No. 33, pp. 12-15) are either questions of law, or questions of fact that are not material to the disposition of the case. The Plaintiff has not disputed any facts presented in the Defendants' statement of uncontroverted facts (Filing No. 24, pp. 2-6), properly referenced with citations to the evidentiary record (Filing No. 25), and those facts are accepted as true. See NECivR 56.1(b)(1).

**I.  Alleged Constitutional Violations and Qualified Immunity**

"In determining whether an officer is entitled to qualified immunity, we ask (1) 'whether, taking the facts in the light most favorable to the injured party, the alleged facts demonstrate that the official's conduct violated a constitutional right'; and whether the asserted constitutional right is clearly established."  *Wallingford v. Olson*, No. 09-1271, 2010 WL 251656 at *3 (8th Cir. January 25, 2010) (quoting *White v. McKinley*, 519 F.3d 806, 813 (8th Cir. 2008)).  The Court "may address either question first."  *Id.* (citing *Pearson v. Callahan*, 555 U.S. ___, ___, 129 S.Ct. 808, 818 (2009)).  "'If either question is answered in the negative, the public official is entitled to qualified immunity.'" *Id.* (quoting *Norris v. Engles*, 494 F.3d 634, 637 (8th Cir. 2007)).  "'To determine whether a right is clearly established we ask whether it would be clear to a reasonable officer that his conduct was unlawful in the situation confronted.'" *Id.*(quoting *White*, 519 F.3d at 813).

    *1.  Unreasonable Search – Alleged Unlawful Entry*

The Plaintiff contends that the officers' entry into the Manderson Street house was an unreasonable search under the Fourth Amendment because they did not announce their presence and authority before entering.  The Plaintiff refers the Court to Neb. Rev. Stat. § 29-411 (Reissue 2008) that provides: "In executing a warrant for the arrest of a person charged with an offense, . . . the officer may break open any outer or inner door or window of a dwelling house or other building, if, after notice of his authority and purpose, he is refused admittance[.]" Accordingly, the Plaintiff contends that the officers violated clearly established law and are not entitled to qualified immunity from suit.

7

Without addressing the question of whether the officers' conduct was contrary to Nebraska state statute, the Court notes that "under section 1983 the issue is whether the government official violated the Constitution or federal law," and not whether a state or local law or policy has been infringed.  *Cole v. Bone*, 993 F.2d 1328, 1334 (8th Cir. 1993). "Conduct by a government official that violates some state statutory or administrative provision is not necessarily constitutionally unreasonable." *Id*., citing *Davis v. Scherer*, 468 U.S. 183, 193-94 (1984).  "State legislatures and government agencies are free to hold government officials to higher standards than the constitution requires." *Id*.  Conversely, "following standard procedure does not necessarily make an officer's acts reasonable." *Smith v. Kansas City, Missouri Police Dept*., 586 F.3d 576, 581 (8th Cir. 2009).

The Plaintiff's claim of unlawful entry is brought under 42 U.S.C. § 1983 and the Fourth Amendment to the United States Constitution, and this Court's analysis of the claim proceeds under the Fourth Amendment's prohibition against unreasonable searches.

"[T]he reasonableness of a search of a dwelling may depend in part on whether law enforcement officers announced their presence and authority prior to entering." *Wilson v. Arkansas,* 514 U.S. 927, 931 (1995).  The common law principle of announcement "is an element of the reasonableness inquiry under the Fourth Amendment." *Id.* at 933. "[I]n some circumstances, an officer's unannounced entry into a home might be unreasonable under the Fourth Amendment." *Id.*  "The Fourth Amendment's flexible requirement of reasonableness should not be read to mandate a rigid rule of announcement that ignores countervailing law enforcement interests. . . . [T]he common law principle of announcement was never stated as an inflexible rule requiring announcement under all circumstances."

*Id.* at 935. The Supreme Court has left to the lower courts "the task of determining the circumstances under which an unannounced entry is reasonable under the Fourth Amendment" holding "that although a search or seizure of a dwelling might be constitutionally defective if police officers enter without prior announcement, law enforcement interests may also establish the reasonableness of an unannounced entry." *Id.*, at 936.

The uncontroverted evidence establishes that Harrison knocked at the front door of the Manderson house, and received no response. When he joined Pollreis at the back door, the door was not merely unlocked, but open – ajar three or four inches. (Filing No. 36-2, Internal Investigation Statement of Pollreis 11/29/2007 ("Pollreis Statement"), p.3.) The officers knocked on the back door before entering the house. (*Id.*) At the time of their entry, the officers' purpose had shifted from the arrest of Barnes to the inspection of an apparently abandoned house. (*Id*. at 7.) Harrison was aware of "a rash of copper and metal thefts from abandoned houses" and "a number of arsons . . . on vacant and abandoned properties." (Filing No. 36, Internal Investigation Statement of Lance Harrison, 11/12/2007 ("Harrison Statement") p. 8.) His purpose in entering the house was two-fold – to make sure there were no squatters in an abandoned house, and to determine if Barnes was indeed there. (*Id.*)

The officers could have announced their identity and purpose before entering the house, or before climbing the stairs to the second floor. Their failure to do so does not make their entry unreasonable under the totality of the circumstances. They knocked and got no response. The house appeared not only unoccupied but completely abandoned. (See photos, Filing Nos. 25-2, 25-3, 25-4.) The "necessity of demand . . . is obviated

[when] there was nobody on whom a demand could be made." *Wilson*, 514 U.S. at 935 (quoting *Pugh v. Griffith*, 7 Ad. & E. 827, 840-841, 112 Eng. Rep. 681, 686 (K.B. 1838)).

This Court concludes that even if the officers' entry into the Manderson Street house were to be construed as a Fourth Amendment violation, such was not clearly established at the time of their entry, and they both have qualified immunity from suit with respect to the Plaintiff's Fourth Amendment claim based on unlawful entry.

### 2.  Unreasonable Seizure – Alleged Excessive Use of Force

"[*A*]*ll* claims that law enforcement officers have used excessive force – deadly or not – in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard." *Graham v. Connor,* 490 U.S. 386, 395 (1989) (emphasis original).  *Graham* lists factors that are relevant to determining whether the force exerted was excessive and in violation of the Fourth Amendment.  The analysis "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officer or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396.  The proper perspective in judging an excessive force claim is that of "a reasonable office on the scene" and "at the moment" force was employed.  *Id.*  From *Graham* is this often-quoted statement:

> The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation . . . .

*Id.* at 396-97.

"To determine objective reasonableness, we must balance 'the nature and quality of the intrusion on [the injured party's] Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion.'" *Ludwig v. Anderson,* 54 F.3d 465, 471 (8th Cir. 1995) (quoting *Tennessee v. Garner*, 471 U.S. 1, 8 (1985)). "Underlying intent or motive are not relevant to the inquiry; rather, 'the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them.'" *Saucier v. Katz*, 533 U.S. 194, 210 (2001). Even if an officer's actions are not objectively reasonable, and a Fourth Amendment excessive force violation is found, a qualified immunity defense may be available.

> The concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular police conduct. It is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts. An officer might correctly perceive all of the relevant facts but have a mistaken understanding as to whether a particular amount of force is legal in those circumstances. If the officer's mistake as to what the law requires is reasonable, however, the officer is entitled to the immunity defense.

*Id.* at 205.

"[T]he question . . . is whether [the] officer . . . , in light of the facts and circumstances confronting him, could have reasonably believed he acted lawfully." *Id.* at 211.

Taking the facts in the light most favorable to Barnes, the crimes underlying the warrants were not "severe," in that they did not involve violence, personal injury, property damage, monetary loss, or moral turpitude.[1] (*See* Warrants at Filing No. 34-3, 34-4, 34-5.)

---

[1] The most serious charge against Barnes was a Class I Misdemeanor offense, Operating a Motor Vehicle to Avoid Arrest, charged by Harrison on July 26, 2007, in

11

Barnes was naked when found, and had no weapons. Barnes posed no apparent threat to the safety of the officers or third parties. He was mildly retarded, although it is not evident that the officers were aware of his retardation. (*See* Affidavit of Jelitha McKenney, Filing No. 34-1, ¶ 5.) He did not actively resist the officers. When he lunged at the closed second-story window, however, a reasonable officer would infer that Barnes was attempting to flee from arrest and that he posed a substantial risk of harm to himself.

Pollreis fired the Taser at Barnes because she believed he was attempting to flee and she believed that her use of the Taser was the amount of force needed to keep him in custody. (Pollreis Aff. ¶ 16.) She also used the Taser in an effort to keep Barnes from hurting himself by crashing through a second-story window. (Pollreis Statement, p. 4: "The guy looked at the window again and he darted right towards the window. As he went by me, I deployed the taser. Um . . . to prevent him from going through the window. To prevent him from injuring himself. To prevent me from going through the window if I went in front of him instead of deploying the taser. So that no one else would get injured.")

While Pollreis's underlying intent or motive is not relevant to the Fourth Amendment reasonableness inquiry[2], her comments illustrate the balance of interests that *is* relevant to the inquiry. The "nature and quality of the intrusion" was the use of non-lethal force, a

---

connection with an incident of July 20, 2007. Other charges against Barnes concerned driving on a suspended license, driving without proper registration or proof of insurance, willful reckless driving, and failure to appear.

   [2] The question under the Fourth Amendment analysis is whether Pollreis's actions were objectively reasonable in light of the facts and circumstances confronting her. "An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional." *Graham,* 490 U.S. at 397.

Taser electroshock device, that causes temporary incapacitation.[3] The "governmental interests justifying the intrusion" were (1) preventing a person who had several warrants for his arrest from fleeing custody, and (2) protecting that individual from the injuries likely to occur if he crashed through a closed second-story window. Even if Pollreis's actions were not considered to be objectively reasonable and were viewed as a Fourth Amendment violation, the question under the qualified immunity analysis is whether her *mistake* about the amount of force that was legal under those particular circumstances *was* reasonable. The Court may address either question first. *Pearson v. Callahan*, 129 S. Ct. 808, 818 (2009).

This Court concludes that a reasonable officer in Pollreis's position would believe that Barnes was attempting to flee from custody; that he posed a substantial danger to himself when he lunged at the second-story window; and that any force less than deployment of the Taser, *e.g.*, attempts to block or tackle him, would put the officer at risk of serious injury or death. A reasonable officer in Pollreis's position could believe that the use of non-deadly force, *i.e.*, the deployment of a Taser electroshock device, could immobilize Barnes before he struck the window, keeping him in custody and preventing him from suffering potentially serious injury.

Pollreis made a split-second judgment under circumstances that were tense, uncertain, and rapidly evolving. The 20/20 vision of hindsight reveals the tragic

---

[3] The function and use of the Taser electroshock device is described and illustrated in the training materials presented in Plaintiff's index of evidence, Filing No. 34-8, 34-9, 35-1, 35-2, 35-3, 35-4. The Court recognizes that the "Taser is a relatively new implement of force, and case law related to the Taser is developing." *Brown v. City of Golden Valley*, 574 F.3d 491, 498 n.5 (8th Cir. 2009).

consequences that led to this lawsuit. Had Pollreis not deployed the Taser, Barnes might have had better muscle control after he crashed through the window, and might have been able to break his fall and avoid the extensive injuries that led to his death. The Court concludes, however, that (1) Pollreis's use of force was objectively reasonable under the circumstances she confronted, and (2) a reasonable officer in her position could have believed she was acting lawfully. Accordingly, the Court finds no Fourth Amendment excessive-use-of-force violation, and also finds that Pollreis is entitled to qualified immunity from suit on the Plaintiff's Fourth Amendment claim based on alleged excessive use of force.

### 3. Due Process

"*[A]ll* claims that law enforcement officers have used excessive force – deadly or not – in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than under a 'substantive due process' approach. Because the Fourth Amendment provides an explicit textual source of constitutional protection against this sort of physically intrusive governmental conduct, that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing these claims."

*Graham*, 490 U.S. at 395.

Accordingly, the Plaintiff has not stated a due process claim.

## II. Failure to Train and Supervise

The Plaintiff alleges that the City of Omaha, and its division, the Omaha Police Department, failed to develop and implement appropriate policies and failed to train and supervise its officers, including Harrison and Pollreis, in the safe, reasonable and

14

appropriate deployment of Taser electroshock weapons, and that such failures resulted in the wrongful seizure of Barnes.

"It is the law in this circuit . . . that a municipality may not be held liable on a failure to train theory unless an underlying Constitutional violation is located." *Schulz v. Long*, 44 F.3d 643, 650 (8th Cir. 1995). Accordingly, the Plaintiff's failure-to-train claim must also be dismissed.

### III.  Negligence and Respondeat Superior

The Defendants contend that the Plaintiff's claims based on negligence and respondeat superior must be dismissed, because the uncontroverted facts demonstrate that Pollreis engaged in an intentional assault and battery – torts that are not covered under the Nebraska Political Subdivisions Tort Claims Act. The Plaintiff contends that the question of an officer's intent is a matter for the jury, and that the negligence claim also embraces a claim against the City of Omaha for negligent failure to develop and implement appropriate policies and to train officers in the use of Tasers.

The Nebraska Political Subdivisions Tort Claims Act ("PSTCA") provides that the Act's limited waiver of sovereign immunity shall *not* apply to "[a]ny claim arising out of assault [or] battery." Neb. Rev. Stat. § 13-910 (7). "Statutes that purport to waive the protection of sovereign immunity of the State or its subdivisions are strictly construed in favor of the sovereign and against its waiver." *Johnson v. State of Nebraska*, 700 N.W.2d 620, 623 (Neb. 2005).

There is no genuine issue of material fact regarding Pollreis's intent to deploy the Taser at Barnes – she intended to shoot him with the probes. Her motive may have been mixed, *i.e.*, to stop Barnes from fleeing and to protect him from crashing through the

15

second-story window.  Her objective may have been benign, rather than hostile. Regardless, the use of force was intentional and not an accident.  Under Nebraska law, it was a battery.  *Westcott v. City of Omaha,* 901 F.2d 1486, 1489 (8th Cir. 1990) ("[H]ostile motive is not an element of battery in Nebraska.") (citing *Bergman by Harre v. Anderson*, 411 N.W.2d 336, 337 (Neb. 1987)); *see also id.* at 1489 ("[T]he intentional tort of battery . . . require[s] an intent which may be shown by proof that the defendant intended to physically injure or contact another[.]") (A "'defendant may be liable [for battery] . . . where . . . a misguided effort is made to render assistance.'") (quoting W. Keeton, D. Dobbs, R. Keeton & D. Owen, *Prosser and Keeton on The Law of Torts* § 8, at 41-42 (5th ed. 1984)).

The Nebraska Supreme Court addressed a case very similar to this one In *McKenna v. Julian*, 763 N.W.2d 384 (Neb. 2009).  The plaintiff sued a police officer, arguing that "he had a viable cause of action against the City of Omaha based on the police officer's alleged negligent use of excessive force during [a] false arrest."  *Id.* at 391.  The Nebraska Supreme Court concluded that an "action based on excessive force still arises out of claims of false arrest or battery and it is therefore barred as a matter of law by sovereign immunity."  *Id.*  The Nebraska Supreme Court also noted that claims based on respondeat superior or alleged negligent supervision are barred by sovereign immunity when the underlying action is an intentional tort excluded from coverage under the PSTCA.  *Id.* (citing *Johnson, supra*).

This Court declined to grant the Defendants' motion to dismiss the Plaintiff's negligence and respondeat superior claims on the basis of *McKenna*, absent an evidentiary record establishing that Pollreis's deployment of the Taser was intentional and

16

not negligent.  Whether or not some negligent calculation on her part, or on the part of Harrison, led to her decision to deploy the Taser, her action was still a battery and artful pleading cannot characterize the conduct as negligence.  "No semantical recasting of events can alter the fact that the battery was the immediate cause of [decedent's] death and, consequently, the basis of respondent's claim."  *Westcott,* 901 F.2d at 1489. "[A]lthough the complaint is grounded in negligence, . . . the alleged negligence was inextricably linked to a battery, and . . . this suit is thus barred by the Nebraska Political Subdivisions Tort Claims Act."  *Id.* at 1490.

The Plaintiff's claim against the City of Omaha, based on the theory of respondeat superior, and any claims she purports to have made against the City of Omaha for negligent failure to train, supervise, or promulgate policies, also must be dismissed. "[W]hen a cause of action is based on the mere fact of government employment, such as a respondeat superior claim, or on the employment relationship between the intentional tort-feasor and the government, such as a negligent supervision or negligent hiring claim, such claim is barred by the PSTCA, and thus the state is immune from suit."  *McKenna*, 763 N.W.2d at 391 (citing *Johnson, supra*).  All the Plaintiff's claims against the City of Omaha *arise out of* the alleged intentional torts of the officers, and sovereign immunity has not been waived with respect to those claims.  *See Westcott*, 901 F.2d at 1490 (clause in Federal Tort Claims Act, identical to Nebraska provision barring claims arising out of assault and battery, "does not merely bar claims *for* assault or battery; in sweeping language it excludes any claim *arising out of* assault or battery.") (emphasis original.).

17

Accordingly, the Plaintiff's claims based on negligence and respondeat superior also will be dismissed.

## CONCLUSION

The material facts in this case are not in dispute. The sequence of events on July 31, 2007, led to a tragic death. Those events, however, as a matter of law do not support the Plaintiff's claims.

Accordingly,

IT IS ORDERED:

1. The Defendants' Motion for Summary Judgment (Filing No. 23) is granted;

2. The Plaintiff's Complaint is dismissed, with prejudice; and

3. A separate Judgment will be entered.

DATED this 10th day of February, 2010.

BY THE COURT:

s/Laurie Smith Camp
United States District Judge